**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARIAM CANNING, ET AL., | * | |
| | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No.  8:21-cv-02381-PX |
| | * | |
| BOARD OF EDUCATION CALVERT | * | |
| COUNTY, ET AL., | * | |
| | | |
| Defendants. | | |

\*\*\*

## <u>MEMORANDUM OPINION</u>

Pending before the Court is the motion to dismiss the Amended Complaint (ECF No. 14), motion to strike praecipes (ECF No. 24), and motion to dismiss from the action Superintendent of Schools Defendant Daniel Curry ("Superintendent Curry") (ECF No. 40), all filed by Defendants Board of Education of Calvert County and Superintendent Curry.  Also pending is the motion for leave to file a second amended complaint (ECF No. 18) filed by Plaintiffs Mariam Canning, Alexsa Billups, Melissa Goshorn, Angelica Hicks, Robin Cox, Diane Andraka, and Diana Baldwin (collectively, "Plaintiffs"), as well as Plaintiffs' motion to strike miscellaneous correspondence (ECF No. 31), Plaintiffs' amended motion to strike miscellaneous correspondence (ECF No. 34), Plaintiffs' motion to substitute party (ECF No. 32), Plaintiffs' amended motion to substitute party (ECF No. 35), and several of Plaintiffs' "praecipes" (ECF Nos. 1-12–1-16; 11; 22).  The issues are fully briefed, and no hearing is necessary.  *See* D. Md. Loc. R. 105.6.  For the following reasons, the Court will grant Defendants' motion to dismiss the Amended Complaint, grant Defendants' motion to strike, deny as moot Defendants' motion to dismiss Daniel Curry, deny all of Plaintiffs' motions, and strike the "praecipes" from the docket.

## I.    Background

This case concerns one of the most controversial dilemmas facing public schools today—how to promote racial equity and inclusion as redress for historic inequalities without resorting to unconstitutional race based policies and practices.  *See, e.g.*, *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, No. 21-cv-296, 2022 WL 579809 (E.D. Va. Feb. 25, 2022); *Menders v. Loudoun Cnty. Sch. Bd.*, No. 21-cv-669 (AJT/TCB), 2022 WL 179597 (E.D. Va. Jan. 19, 2022); *Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, 560 F. Supp. 3d 929 (D. Md. 2021); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, 996 F.3d 37 (1st Cir. 2021); *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 272 (S.D.N.Y. 2019), *aff'd*, 788 F. App'x 85 (2d Cir. 2019).  This dilemma is real, fraught with difficult questions of constitutional magnitude, and merits serious attention.  However, the manner in which Plaintiffs have pursued their cause of action is so fundamentally flawed, the case cannot get off the starting blocks.

Plaintiffs are seven individuals who reside in Calvert County and have some connection to the Calvert County Public Schools ("CCPS").  Three—Alexsa Billups, Melissa Goshorn, and Angelica Hicks—are parents of children currently enrolled at a CCPS school, although the Court cannot discern from the pleadings which schools their children attend.  ECF No. 13 ¶¶ 1–4.  Two others—Robin Cox and Diane Baldwin—are grandparents of current CCPS students, but neither Plaintiff is identified as the legal guardian of, or as a person with authority to make educational decisions for, their grandchildren.  *Id.* ¶¶ 5, 7.  Plaintiff Diane Andraka's children had attended CCPS in the past, but nothing in the pleading suggests when or at what school.  *Id.* ¶ 6.  Plaintiff Mariam Canning has children "eligible" to attend CCPS.  *Id.* ¶ 1.

Defendant Board of Education for Calvert County ("the Board") is the corporate body responsible for curriculum and policy across the twenty-two CCPS schools which educate approximately 15,000 students.  ECF No. 13 ¶¶ 8, 13, 15.  Created by statute, the Board includes five locally elected members and one non-voting student elected by the CCPS high school student body.  ECF No. 13 ¶ 8; *see also* Md. Code. Ann., Elec. Law §§ 8-801–8-806; Md. Code Ann., Educ. § 3-301–3-304.  Superintendent Curry is the only named individual Defendant.  ECF No. 13 ¶ 9.  He acts as the executive officer, secretary, and treasurer of the Board.  *See* Md. Code. Ann., Educ. § 4-102.

Plaintiffs allege that CCPS has violated students' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title VI of the Civil Rights Act of 1984, 42 U.S.C. § 2000d, the First Amendment to the United States Constitution, the Equal Protection Clause of the Maryland State Constitution, and the "Maryland Quality Education Requirement."  ECF No. 13 ¶¶ 153–232.  The Amended Complaint generally maintains that the "children and grandchildren of Plaintiffs and interested persons have received different punishments for infractions based on race alone," (ECF No. 13 ¶ 150), and that "the children and grandchildren of Plaintiffs and interested persons . . . have already experienced the harmful effects of division of students based on race."  *Id.*  According to Plaintiffs, CCPS engages in "disparity in discipline based solely on skin color" and implements "curriculum discussing racism" that has the effect of "increas[ing] racial division among students that did not exist prior to implementation of these policies and practices, indoctrination of teachers and the push for discussion of white privilege."  *Id.* ¶ 165.  These "discriminatory actions," say Plaintiffs, "will cause significant psychological harm to Plaintiffs and other members of the CCPS student body."  *Id.* ¶¶ 164, 179.

The Amended Complaint provides little detail to shore up these broad characterizations or state a coherent claim for any particular student attending CCPS. *See generally* ECF No. 13. Rather, the Amended Complaint throws together a compendium of policies, directives, curriculum guidance, and academic source materials, claiming they collectively promote a "radicalized political agenda." *Id.* ¶ 18. To impose some order on the Plaintiffs' suit, the Court first summarizes the scores of challenged CCPS policies and source materials incorporated in the Amended Complaint. *See generally* ECF Nos. 13-1–13-19. It next summarizes the handful of incidents recited in the Amended Complaint that Plaintiffs allege are the direct result of CCPS' purported radical agenda.

### A.   Challenged CCPS Policies

**Group 1: Broad Pronouncements of CCPS' Dedication to Equity and Inclusion in its Schools.** Plaintiffs attach a series of CCPS policy statements which Plaintiffs believe have fueled racism toward white students. None plausibly suggest an overt or implicit agenda of race discrimination. Quite the opposite, in fact. "Policy Statement # 1015(Administration) of the Board of Education Regarding Equity" (ECF No. 13-1), voices CCPS' general commitment to creating an "equitable, fair, safe, diverse, and inclusive" learning environment for all students, and to identifying "structural, institutional barriers, and social identifiers that could prevent students from equitably accessing educational opportunities." ECF No. 13-1 at 1. Similarly, "Policy Statement (Administration) of the Board of Education Regarding Antiracism," affirms the Board's "unwavering" commitment to "combating racism" generally at CCPS. ECF No. 13-2 at 1. This policy articulates CCPS' general intent to "understand the concept of white privilege and its impact in achieving equity," and to provide to CCPS staff "training on equity, and the impact of bias, culture and how to deal with conflict." *Id.* As does the included "Anti-Racism

4

Resolution" which articulates the uncontroversial view that "racism has no place in [CCPS] schools" and affirms CCPS' commitment to "protect the constitutional rights of each person who attends or works in [the CCPS] district."  *See* ECF No. 13-3.  Plaintiffs also include a June 3, 2020, open letter authored by Superintendent Curry which articulates a broad commitment to fostering a "safe place for each student and adult" by "eliminating bias, racism, and inequities from our system."  ECF No. 13-11 at 1.

**Group 2:  The CCPS 5-Year Action Plan**.  The Complaint next takes issue with the "CCPS 5-Year Action Plan Addressing Cultural Proficiency 2018-2023" ("5-Year Action Plan"), a mission statement with the objective to increase educational "access and opportunity for all." ECF No. 13-4 at 2.  The Plan addresses three topics: (1) elevating CCPS staff's "proficiency level in discussing equity, culture, ethnicity, and race"; (2) establishing outside partnerships with resources "connected to the work of cultural proficiency and minority achievement"; and (3) creating and implementing a "culturally responsive curriculum."  ECF No. 13-4 at 8–11.  The Plan includes an educational module entitled "Learning for Justice," which teachers "rely upon" in designing curriculum as part of CCPS' stated objective to raise cultural awareness of its staff. *See id.*; ECF No. 13 ¶ 80.

One hundred pages from the Learning for Justice module are also incorporated into the Amended Complaint.  This attachment includes reading lists, opinion pieces, discussion topics, and classroom exercises related to race and identity.  *See* ECF Nos. 13-5, 13-7, 13-10.  Plaintiffs characterize these recommended resources as "radical ideology," and claim, without explanation, that such ideology has led to CCPS implementing a "discriminatory curriculum" that amounts to "new racism against white students and students of color."  ECF No. 13 ¶¶ 102, 105, 159, 208.

**Group 3: A Smattering of Other Pedagogical Resources That Refer to Racial Awareness, Inclusion, or Educational Equity.**  These materials include a Sesame Street coloring page assignment provided to a first grade student at Huntingtown Elementary School (ECF No. 13-6); a "Comprehensive Health Education Instructional Programs for Grades Prekindergarten-12" description (ECF No. 13-9; ECF No. 13 ¶ 121); a flier for an optional "Read Woke" book club at an unidentified CCPS school (ECF No. 13-16); a series of "recommended" articles and books for CCPS students (ECF Nos. 13-12–13-15; ECF No. 13 ¶¶ 127, 129, 131); and a partially obstructed screenshot of reading material that is "promoted" at the Huntingtown High School library (ECF Nos. 13-17; 13 ¶¶ 130–34).  All reflect CCPS' general commitment to racial equity and inclusion in broad terms.

**Group 4:  Documents Related to Student Discipline.**  Plaintiffs incorporate into the Amended Complaint CCPS' "Students' Rights, Responsibilities and Code of Conduct" ("Student Manual" or "Manual") which sets out a graduated and comprehensive progressive discipline system.  The Manual is largely silent on issues involving race.  *See generally* ECF No. 13-18. Despite this, the Amended Complaint avers that students of color receive "special treatment . . . as it relates to disciplinary and suspension procedures."  ECF No. 13 ¶ 139.  Plaintiffs focus solely on a section addressing progressive discipline for "bias behavior."  *Id.* ¶ 140.  The Manual defines "bias behavior" in broad, race neutral terms, as any conduct which "directly or indirectly demonstrate[s] racism, hostility or contempt toward a person or group on the basis of actual or perceived identity."  ECF No. 13-18 at 44.

### B.  Alleged Incidents Involving CCPS Students

As to alleged acts or omissions which Plaintiffs believe emanate from CCPS' "radical ideology," (ECF No. 13 ¶¶ 46, 102, 140, 190), the Court can find only a handful of cursory

references to actual student experiences.  First, the Amended Complaint describes an elementary school graduation during which a student of color called another unnamed white student a "cracker" and pelted the white student with actual crackers.  ECF No. 13 ¶ 150.  According to Plaintiffs, the offending student was not reprimanded on account of the incorporated CCPS policies and practices.  *Id.*

Second, a seventh grade class at Windy Hill Middle School was required to read "Ghost Boys," a novel in which a black boy is killed by a white police officer.  *Id.* ¶ 135.  Plaintiffs aver that this assignment "tainted" students' "perspective on the world," and is but "one example of the consequences of mandating the policies and practices described herein."  *Id.*

Third, an unidentified 11th grade student at Huntingtown High School was required to complete an assignment which included a class discussion about the concept of white privilege. The student received a "zero" on the project because he or she refused to participate.  *Id.* ¶ 152.

Fourth, Plaintiff Baldwin maintains that her grandchildren, who are white, receive disproportionately greater punishment than other students of color.  ECF No. 13 ¶ 61.  As an example, the Amended Complaint notes that a student of color who brought a gun to their elementary school received "little to no reprimand," while her grandchildren received "harsher punishment" for comparatively "minor infractions."  *Id.*

No other details related to these incidents are included in the Amended Complaint.

## II.   Procedural History

On August 12, 2021, Plaintiffs filed their original complaint in Calvert County Circuit Court and a motion for preliminary injunction on September 2, 2021.  ECF No. 5 ¶¶ 117–175; *see also Canning, et al. v. Calvert Cnty. Bd. Educ., et al*., No. C04-cv-21-000200 (Cir. Ct. Calvert County), Maryland Judiciary Case Search

https://casesearch.courts.state.md.us/casesearch/ (under "Search By Case Number," select "Calvert County Circuit Court" and enter case number C04-cv-21-000200 (last visited June 24, 2022).  To their original complaint, they also attached "Plaintiffs' Praecipe Regarding Interested Persons" comprised of ninety-one affidavits.  *See* ECF No. 1-12–1-16.  Eighty of the affidavits are nearly identical, each a pre-printed attestation of general support for the litigation from parents or grandparents of students "eligible" to attend CCPS, or from Calvert County taxpayers.[1]  *See id.*

Defendants timely removed the case to this Court, moved to dismiss the Complaint and opposed the motion for preliminary injunction.  ECF Nos. 1, 8.  Plaintiffs next filed a "Second Supplement to Praecipe Regarding Affidavits of Interested Persons."  ECF No. 11.  This filing includes sixty-four more pages of identical affidavits from "tax paying citizen[s]" or parents and grandparents of children "eligible" to attend school in Calvert County, all of whom support the Plaintiffs' suit.  ECF No. 11 at 5, 9; *see generally* ECF No. 11.

On October 14, 2021, the Court held a recorded conference with the parties to express concern about the viability of the Complaint, including whether any named Plaintiff had standing to sue.  *See* ECF No. 12.  The Court invited Plaintiffs to amend the Complaint to address the noted deficiencies.  *See id.*  Plaintiffs voluntarily withdrew the motion for preliminary injunction and agreed to file an Amended Complaint for the reasons discussed at the conference.  *See id.*

October 28, 2021, Plaintiffs filed the Amended Complaint.  ECF No. 13.  It largely mirrors the original Complaint but augments Plaintiffs' general concerns about certain of CCPS' policies and procedures.  ECF No. 13-20 ¶¶ 48–51, 54–57, 61, 65–78, 121–24, 133–35.

---

[1] The remaining affidavits are from the seven named plaintiffs, three expert witnesses, and an African American Calvert County resident with school-aged children, also expressing his support for the preliminary injunction.  *See* ECF Nos. 1-12 at 6–47; 1-13; 1-16.

Defendants filed a renewed motion to dismiss (ECF No. 14), and Plaintiffs' buckshot approach to litigation continued.

On December 15, 2021, Plaintiffs filed a motion to amend the First Amended Complaint to add three plaintiffs—Christopher Judy and Taylor Bromwell ("the Judys"), and Melody Sierra. ECF No. 18-1 ¶¶ 156–180. The proposed amended pleading avers that the Judys' son, a fourth grader at Plum Point Elementary School, was "traumatized" after a teacher wrote "don't be racist" on his assignment about Maya Angelou (ECF No. 18-1 ¶¶ 157–166). Plaintiffs maintain this incident is connected to CCPS' "implementation of tenets of critical race theory, white shaming, and teaching of the oppressor versus oppressed mentality." *Id.* ¶ 166.

As to Sierra, the proposed amended pleading avers that she is the mother of two white students who attend Southern Middle School and Patuxent High School respectively.[2] ECF No. 18-1 ¶¶ 167–73. The younger son has been "bullied and harassed by a student of color since October 2021" including being tripped in the lunchroom, called hurtful names, and stabbed in the neck with a pencil; but despite Sierra's repeated requests for remedial action, the school has done nothing, all on account of nonspecific "new policies and practices." *Id.* ¶¶ 168–72. The high schooler is alleged to have "witnessed an African American student stab another student," and knows of other similar physical encounters which have gone unaddressed by the school, also because of "new disciplinary practices and procedures adopted by the Board and Dr. Curry." ECF No. 18-1 ¶¶ 176–179.

---

[2] The proposed Second Amended Complaint actually states that the elder son attends Southern High School. ECF No. 18-1 ¶ 168. Defendants point out that "Southern High School" does not exist in Calvert County. ECF No. 23 at 3 n.2. In response, Sierra submits a revised affidavit clarifying that her son attends Patuxent High School within Calvert County. ECF No. 28-2 ¶ 13. Defendants have not challenged the revised affidavit, and the Court accepts this correction as true.

Plaintiffs next filed a "Third Supplement to Praecipe Regarding Interested Persons," which includes more affidavits from Calvert County community members who support the litigation. ECF No. 22. Defendants oppose both the proposed Second Amended Complaint and the continued "praecipes," and ask that they all be stricken from the docket. ECF Nos. 23, 24.

Plaintiffs have also filed two motions to "substitute" parties, neither of which are true motions to substitute. Rather, the motions seek leave to add three parents as Plaintiffs and then to replace all named Plaintiffs with an entity created by Plaintiffs' lead counsel and given the moniker "Save Calvert Schools, LLC." ECF Nos. 32 & 35. As for the three "substitute" plaintiffs, two are the parents of a student who had been assaulted by three African American students at Calvert High School without any response from Defendants, purportedly on account of unidentified "new race-based policies that lessen consequences for students of color." ECF Nos. 32-3 ¶ 20; 32-2 ¶ 20. The other proposed Plaintiff identifies as the parent of the fifth-grade student described in the Amended Complaint as having been called a "cracker" at graduation. ECF No. 35-1 ¶¶ 5, 11. The mother summarily attributes this incident to the "teachings, practices, and policies incorporating certain tenets of critical race theory" at CCPS. *Id.*

With this procedural history in mind, the Court turns to the pending motions.

## III.        Motion to Dismiss Amended Complaint

Defendants maintain that the Amended Complaint should be dismissed for lack of standing and for insufficiency of the claims. ECF No. 14-2 at 1–3. Because this Court agrees that it lacks standing, it accordingly lacks subject matter jurisdiction to hear the claims. Thus, it must confine its analysis solely to the standing question. *Ali v. Hogan*, 26 F.4th 587, 600 (4th Cir. 2022) (quoting *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013)) ("[D]ismissal for lack of standing – or any

other defect in subject matter jurisdiction – must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits.").

### A. Legal Standard

Standing implicates a court's subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Fed. R. Civ. P. 12(b)(1); *see Beck v. McDonald*, 848 F.3d 262, 269–70 (4th Cir. 2017); *see also Carrero v. Farrelly*, 310 F. Supp. 3d 542, 545–56 (D. Md. 2018).  A party's standing to maintain an action "is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Davis v. F.E.C.*, 554 U.S. 724, 733 (2008) (citations omitted).  Standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Overbey v. Mayor of Balt.*, 930 F.3d 215, 227 (4th Cir. 2019) (citation omitted).

In a facial challenge to standing, the plaintiff is afforded the same procedural protections that exist when evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).  Thus, the Court must "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party."  *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013).  Standing, however, may not be created through the court "embellishing otherwise deficient allegations."  *S. Walk*, 713 F.3d at 182 (quoting *Whitmore v. Arkansas.*, 495 U.S. 149, 155–56 (1990)).  The Court cannot "take account of allegations in the complaint labeled as fact but that constitute nothing more than legal conclusions or naked assertions."  *David*, 704 F.3d at 333 (internal quotations omitted).

Exhibits attached to the complaint may be considered in evaluating a motion to dismiss for lack of standing.  *S. Walk*, 713 F.3d at 182. (citing Fed. R. Civ. P. 10(c)); *see also Katyle v.*

*Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011).  But if conflict arises between the complaint allegations and an exhibit, the exhibit controls.  *S. Walk*, 713 F.3d at 182 (quoting *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).  Further, when plaintiffs seek injunctive relief, as here, they must demonstrate that at least one plaintiff is presented with a "real or immediate threat" from which she "will suffer an injury in the future." *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  Thus, Plaintiffs "must establish an ongoing or future injury in fact" exists for at least one plaintiff such that injunctive relief could conceivably redress the harm.  *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018).

### B.  Analysis

Defendants principally assert that Plaintiffs lack standing because they have failed to make plausible having suffered any legally cognizable injury in fact.  ECF No. 14-2 at 5–10.  To satisfy standing, Plaintiffs must, at a minimum, plausibly aver that for each claim, at least one Plaintiff suffered:  (1) "an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant;" and (3) the injury is capable of redress "by a favorable decision." *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009); *see also Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

To allege an injury in fact, the plaintiff must aver that she suffered "an invasion of a legally protected interest" that affects the plaintiff in a "personal and individual way."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted).  A "personal stake" must amount to more than allegations of generalized harm to a group or community.  *See Lexmark Int'l, Inc. v.*

*Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344–346, (2006); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–86 (1982); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563–64 (1992).  Put differently, a plaintiff with such a personal stake must be able to answer the fundamental question: "what's [this litigation] to you?"  *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citation omitted).

Defendants first turn the Court's attention to Plaintiffs Canning and Andraka, arguing they lack standing because they are parents of students who do not currently attend a CCPS school.  ECF No. 14-2 at 4; *see also* ECF No. 14-3 ¶¶ 3–6.  Parents retain standing to sue on behalf of their children who have been injured by a defendant's alleged wrongdoing.  *See, e.g., Valley Forge*, 454 U.S. at 486 n. 22 (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 224 n.9 (1963)) ("The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed.  These interests surely suffice to give the parties standing to complain.").  A child merely "eligible" to attend CCPS, but who is educated elsewhere, could not have suffered any injury from CCPS' allegedly unconstitutional practices and policies.  Likewise, a student who may have attended CCPS at a time other than when the challenged policies are in force cannot claim any legally cognizable injury.  By extension, the parents of such non-injured students lack standing to pursue this litigation.  *See Lujan*, 504 U.S. at 560; *cf. Hope v. Trump*, No. RDB-19-842, 2019 WL 4447319, at *2–3 (D. Md. Sept. 17, 2019) (no concrete injury when plaintiff asserted generalized disagreement with actions and policies of the president but failed to identify any individualized harm).  Thus, Canning and Andraka lack standing to sue.

As to Plaintiffs Billups, Goshorn, and Hicks, although each has a child enrolled in a CCPS school, no facts make plausible that any of the children suffered any concrete or particularized injury.  Indeed, the children are not mentioned *at all* in the Amended Complaint. Nor can they be properly swept within the broad generalizations of wholesale denial of "educational opportunities" or racially discriminatory "disciplinary and suspension practices." *E.g.*, ECF No. 13 ¶ 210.  Put differently, without any detail about how CCPS' supposed racially discriminatory policies actually harmed their children, these parents have no more "personal stake" in the litigation than anyone else in the community who may be generally dissatisfied with the changes afoot.  *E.g.*, ECF No. 13 ¶¶ 142, 147, 161, 179, 180, 191, 194, 201, 211, 213, 216. Thus, none have standing to pursue the claims.

Cox and Baldwin, as grandparents of CCPS students, have even less personal skin in the game than parents of the unnamed CCPS students.  Grandparents do not automatically retain standing to sue on behalf of their grandchildren.  *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 66–67 (2000) (refusing to recognize a constitutionally protected interest in the grandparent-child relationship); *see also Williams v. Burnette*, No. CBD-19-2584, 2020 WL 4732137, at *5 (D. Md. Aug. 14, 2020) ("The United States Supreme Court has stated that while the Due Process Clause protects the fundamental rights of parents to make decisions regarding the care, custody, and control of their children . . . that right does not transfer to grandparents.") (internal citation omitted).  And nothing in Amended Complaint makes plausible that Cox or Baldwin share custodial or financial responsibility for the child, nor are they accountable for ensuring the child attends school and receives an education.  Accordingly, they cannot be said to suffer any "injury in fact" arising from CCPS' challenged policies and practices.

In short, no Plaintiff has plausibly averred sufficient injury to confer standing.  Thus, the

Amended Complaint must be dismissed entirely.

The Court next turns to Plaintiffs' motions.  Together they represent Plaintiffs' seriatim attempts to find at least one Plaintiff with standing.  None are availing.  Below explains why.

## IV.    Plaintiffs Motion for Leave to File Second Amended Complaint

The proposed Second Amended Complaint seeks to add the Judys and Sierra as Plaintiffs on behalf of their sons.  *See* ECF No. 18-1.  Defendants oppose, arguing that amendment is futile because the Judys and Sierra also lack standing.  ECF No. 23 at 4, 9.  The Court agrees with Defendants.

The Court retains broad discretion to grant motions for leave to amend brought pursuant to Rule 15 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 15(a)(2).  Although leave to amend should be freely given, it is properly denied when amendment would "be prejudicial to the opposing party, when the moving party has acted in bad faith or with a dilatory motive, or when the amendment would be futile."  *Arora v. James*, 689 F. App'x 190, 190–91 (4th Cir. 2017) (quoting *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006)) (internal quotation marks omitted).  A claim is futile when it is "clearly insufficient or frivolous" and thus cannot survive a motion to dismiss.  *Whitaker v. Ciena Corp.*, No. RDB-18-0044, 2018 WL 3608777, at *3 (D. Md. July 27, 2018) (quoting *Anand v. Ocwen Loan Servs., LLC*, 754 F.3d 195, 200 (4th Cir. 2014)); *Kerrigan v. Bd. of Educ. of Carroll Cnty.*, No. JKB-14-3153, 2016 WL 470827, at *3 (D. Md. Feb. 8, 2016).

Viewing the proposed additional facts as true and most favorably to Plaintiffs, neither the Judys nor Sierra has alleged a sufficient concrete and particularized injury that is fairly traceable to the alleged offending policies or that is redressable by this suit.  As to the Judys, their son suffered trauma because the teacher commented "don't be racist" on his Maya Angelou paper.

Even if the teacher's statement is fairly read as critical of the student, nothing in the allegation identifies a legally protected interest of the student that CCPS or Superintendent Curry "invaded" through the teacher's remark.  Alternatively, even if the Court could divine invasion of some legal interest arising from this isolated incident, the pleading fails to make plausible that any such injury would persist absent the injunctive relief that Plaintiffs seek.  *See Kenny*, 885 F.3d at 287.

Nor does the proposed amendment demonstrate that the claimed injury is either traceable to any particular CCPS policy, practice, or procedure such that elimination of the same will remedy the harm.  Instead, Plaintiffs baldly contend that the teacher's comment is "the result of implementations of tenets of critical race theory."  ECF No. 18-1 ¶ 166.  But nothing in the pleading makes the connection between the comment "don't be racist" on a paper and any of the challenged CCPS policies and practices.  Because Plaintiffs have not shown the claimed injury is either traceable to the policies or redressable by their elimination, the Judys lack standing to sue. *Cf. Kenny*, 885 F.3d at 287–88 (holding student previously arrested had standing to challenge specific criminal statute as void for vagueness).

Similarly, Sierra's claims are insufficient to confer standing.  As to her middle-school son, CCPS' alleged failure to act after he had been bullied and assaulted by an African American student is blamed on nonspecific "new policies and practices."  ECF No. 18-1 ¶¶ 172–75.  The scattershot incorporation of all CCPS policies and procedures, unified only by some mention of combating racism, does not make the school's inaction fairly traceable to much of anything.  Nor can the Court conceive of how Plaintiffs' requested relief—literally removing from all twenty-two CCPS schools any reference to equity, inclusion, or racially aware curricula—could provide proper redress.  *See* ECF No. 13 ¶ 171 (requesting the Court "[o]rder Defendants to remove all

policies, practices, procedures and materials described herein from the CCPS curriculum, faculty and staff training, CCPS codes of conduct, and any other aspects of the CCPS environment.").

As to Sierra's high school son, the proposed Second Amended Complaint alleges only that he has "witnessed" a student of color physically assault others and receive no school discipline for his misconduct. ECF No. 18-1 ¶¶ 176–179. As solely a witness to such terrible incidents, the Court is at a loss for how Sierra's son suffered a legally cognizable injury in fact arising from any identifiable school policy or practice. *Cf. Lexmark Int'l*, 572 U.S. at 127 n.3 (collecting cases confirming that plaintiff lacks standing to pursue generalized grievances on behalf of group). Viewing the facts pleaded in the proposed Second Amended Complaint as true, none confer standing on any one Plaintiff for any of the claims. Amendment is thus futile, and the motion must be denied.

## V.     Plaintiffs' "Praecipes"

The Court next turns to Plaintiffs' "praecipes." ECF Nos. 1-12–1-16; 11; 22. A "praecipe" is "an archaic legal term to describe a written request filed with the court seeking the issuance of a writ or other action." *Brown v. Prince George's Cnty. Bd. Educ.*, No. GJH-18-2723, 2019 WL 3944983, at *1 n.1 (D. Md. Aug. 20, 2019) (quoting *Mason v. Montgomery Cnty.*, No. PWG-13-1077, 2016 WL 4437642, at *2 n.3 (D. Md. Aug. 23, 2016)); *see also* "Praecipe," http://www.meriam-webster.com/dictionary/preaipe (last visited June 24, 2022). "Long ago" the Federal Rules of Civil Procedure "eliminated the need to resort to these common law pleading relics." *Brown,* 2019 WL 3944983, at *1 n.1 (citing Fed. R. Civ. P. 7(b)(1)). If a party wishes to request relief in federal court, the party must file a motion.

Plaintiffs' "praecipes" identify scores of "Interested Persons" who want this Court to know they support this case. *E.g.*, ECF No. 22 at 1–2. But no legal grounds exist for the Court

to consider the "praecipes."  In the American system of justice, cases are won and lost not based on their popularity, but on their legal merits.  *See Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 221–27 (1974); *United States v. Richardson*, 418 U.S. 166, 188–97 (1974) (Powell, J., concurring).  Cheering on one side or the other has no place in resolving the parties' current disputes.

Nor do any of the affiants included in the "praecipes" have standing to sue.  They are concerned citizens who disagree vigorously with CCPS' approach to thorny issues of race in education.  This opposition alone may provide the affiants the impetus to exercise their right to vote in Calvert County local elections.  But it most certainly does not confer a right to sue.  The "praecipes" are irrelevant and so are stricken from the docket.

## VI.     Plaintiffs Motions to Substitute Parties

Lastly, Plaintiffs' motions seeking "substitution" of parties (ECF Nos. 32 & 35), must be denied.  Rule 25 of the Federal Rules of Civil Procedure governs such motions, permitting substitution of an individual litigant upon death or incompetency, transfer of interest, or where substitution is warranted for public officers who have died or left office.  *See* Fed. R. Civ. P. 25.  Plaintiffs do not even try to justify their motions as properly seeking "substitution" under Rule 25.  Thus, the motions can be denied on this basis alone.

But even if the Court liberally construes the motions as seeking leave—yet again—to add parties to the Amended Complaint, the motions would be denied on futility grounds.  Two of the proposed Plaintiffs are the parents of a student assaulted by African American students at Calvert High School, and the other is parent of the fifth grader that had been called "cracker" at graduation.  These parents claim that Defendants did nothing to address these incidents on account of "new race-based policies that lessen consequences for students of color," (ECF Nos.

18

32-3 ¶ 20; 32-2 ¶ 20) and general "tenets of critical race theory." ECF No. 35-1 ¶¶ 4, 11. But Plaintiffs have failed to show how their claimed injury—black students had not been disciplined when they ought to be—give the white student-victims standing to bring an equal protection challenge to the CCPS disciplinary policies.

Indeed, CCPS' policies on student discipline mention only that acts of racism will be punished. ECF No. 13-18 at 44. The policies are facially neutral; they do not impose discipline differently based on the race of the student who commits an offense on school property. *Id.* Nor are there any facts to make plausible that any CCPS policy had been implemented in a racially discriminatory manner. Simply alleging that a student of color deserved harsher discipline for his actions does not make that claim traceable or redressable to any particular CCPS policy such that granting the Plaintiffs' requested relief will remedy the problem identified. These Plaintiffs too lack standing, and any motion to add them must be denied as futile.

Similarly, the requested substitution of Save Calvert Schools, LLC for all individual Plaintiffs fails for lack of standing. ECF No. 35. Save Calvert Schools, LLC has no corporate structure, no board, and exists only for the ambiguous purpose of "performing any lawful act and/or entering into any business." ECF No. 32-1. When read in conjunction with Plaintiffs' motion, the organization appears to have been created solely to pursue this litigation.

At best, Save Calvert Schools, LLC could proceed on a theory of associational standing, which permits an organization to "stand-in" for its members if it could show at least *one* member has standing to sue in his or her own right. *S. Walk*, 713 F.3d at 184. Accepting as true that all individuals "interested" in this litigation are now part of Save Calvert Schools, LLC, this Court has not found that any have standing. Plaintiffs have failed to show how the association, which exists only for the purpose of litigating this case, retains standing when they could not

demonstrate standing for any given member.[3]  Any motion to amend to add Save Calvert County, LLC, whether it be by substitution or amendment, is an exercise in futility.  The motion is thus denied.

## VII.   Conclusion

For the reasons discussed, Plaintiffs have failed to demonstrate standing to sue under the First Amended Complaint, despite this Court's leave to amend so that they may cure the jurisdictional defect.  *See* ECF No. 12.  The Court has also considered Plaintiffs' second motion to amend, their motions to "substitute," and their "praecipes"—all with an eye toward any facts to make plausible that just *one* individual Plaintiff has met the standing requirements.  The Court has found none.  Accordingly, the matter must be dismissed for lack of standing.[4]

Because this Court lacks jurisdiction, it cannot reach the merits of the claims, and so it must necessarily dismiss without prejudice.  *See Ali*, 26 F.4th at 600.  Nonetheless, the Court recognizes Plaintiffs' penchant for clogging the docket with near baseless motions that, time and again, have failed to meet the most basic pleading requirements.  Should Plaintiffs refile suit, they are forewarned: they must comply with the Federal Rules of Civil Procedure or risk Rule 11 sanctions, to include the Court's striking of any noncompliant pleadings, ordering payment of defense costs, and even dismissing the action with prejudice for abuse of process.  *See* Fed. R. Civ. P. 11; *Kalos v. Centennial Sur. Assocs., Inc*., No. CCB-12-1532, 2012 WL 6210117 (D. Md. Dec. 12, 2012) (sanctioning plaintiffs under Rule 11 for multiple frivolous filings by enjoining

---

[3] Plaintiffs have also completely failed to demonstrate they could meet the two additional elements of associational standing, namely that the organization's interests that it seeks to protect through the litigation are "germane to the organization's purpose," or that the individual members in suit need not participate in the litigation for relief to be accorded.  *S. Walk*, 713 F.3d at 184.

[4] Remaining miscellaneous motions can be summarily addressed.  Plaintiffs' motions to strike Defendants' letter of supplemental authority at ECF No. 27 are baseless and are thus denied.  ECF Nos. 31 & 34.  Superintendent Curry's motion to dismiss him as a party to the lawsuit because of his imminent retirement (ECF No. 40) is denied as moot.

filing of future complaints absent leave of court); *Ballentine v. Taco Bell Corp.*, 135 F.R.D. 117, 126 (E.D.N.C. Feb. 1, 1991) (finding dismissal with prejudice appropriate sanction under Rule 11 when complaint was filed only to harass defendant); *see also King v. Fleming*, 899 F.3d 1140, 1149–50 (10th Cir. 2018) (upholding dismissal with prejudice as Rule 11 sanction).  The Court trusts that Plaintiffs will take heed.

    A separate order follows.

June 27, 2022                                    /S/
Date                                            Paula Xinis
                                             United States District Judge